# EXHIBIT A



**Bank Card Merchant Agreement/Application**

9.2015-VNTV MM

## MERCHANT INFORMATION

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each individual or business that opens an account. What this means to you— When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We will also ask to see your driver's license and/or other identifying documents.

| FEDERAL TAX ID 26-0565897 | NUMBER OF LOCATIONS 9 |

TYPE OF LEGAL ENTITY ☐ Sole Proprietor ☐ LLC ☒ Corporation ☐ Financial Institution ☐ Government ☐ Non-Profit
☐ Other (provide detail) ☐ Publicly Traded ☐ SEC Filing Ticker Symbol:
☐ Partnership: Name of Signer      Execution Date:

BUSINESS LEGAL NAME (IF ORGANIZED AS A SOLE PROPRIETORSHIP, MUST BE OWNER'S PERSONAL NAME) – TO AVOID IRS PENALTIES, LEGAL NAME MUST MATCH FEDERAL INCOME TAX RETURN
PIRCH, INC

| DOING BUSINESS AS ("DBA")/DISREGARDED ENTITY/STORE NAME (STORE NAME IS NAME THAT WILL APPEAR ON RECEIPT) PIRCH | STORE NUMBER 1 | MCC/SIC 5722 |

| CORPORATE PHYSICAL ADDRESS (PHYSICAL ADDRESS ONLY—NO PO BOXES) 9620 Towne Centre Drive, Suite 100 | YEARS AT ADDRESS 2 | CITY San Diego | STATE CA | ZIP 82121 |

| CORPORATE MAILING ADDRESS (IF DIFFERENT FROM PHYSICAL ADDRESS) ABOVE | CITY | STATE | ZIP |

| BUSINESS PHONE (INCLUDE AREA CODE) 858-966-3636 | CUSTOMER SERVICE PHONE (INCLUDE AREA CODE) 858-966-3636 | EMAIL ADDRESS AR@pirch.com |

| BUSINESS FAX (INCLUDE AREA CODE) 858-966-3622 | HAS THIS BUSINESS EVER FILED BANKRUPTCY? ☐ Yes Date: | ANY PRESENT INTENT TO FILE BANKRUPTCY? ☐ Yes ☒ No |

## AUTHORIZED REPRESENTATIVE INFORMATION

**1** | NAME David G. Robson | TITLE CFO | % OWNERSHIP | SOCIAL SECURITY NUMBER XXXXXXXXXXXXXX | DATE OF BIRTH XXXXXXXXXX |

| HOME ADDRESS (PHYSICAL ADDRESS ONLY—NO PO BOXES) REDACTED | YRS. AT ADDRESS | HOME PHONE |
| CITY REDACTED | STATE REDACT | ZIP REDACTED | CELL PHONE |
| DRIVER'S LICENSE | DATE OF ISSUE | DATE OF EXPIRATION |

**2** | NAME | TITLE | % OWNERSHIP | SOCIAL SECURITY NUMBER | DATE OF BIRTH |

| HOME ADDRESS (PHYSICAL ADDRESS ONLY—NO PO BOXES) | YRS. AT ADDRESS | HOME PHONE |
| CITY | STATE | ZIP | CELL PHONE |
| DRIVER'S LICENSE | DATE OF ISSUE | DATE OF EXPIRATION |

## ADDITIONAL INFORMATION

| Current Ownership Established (Date) | Do you Currently Accept Credit Cards? ☒ Yes ☐ No |
| Business Established (Date) 07/01/2007 | Who is your Current Processor? ELAVON |

Merchandise/Services Sold
APPLIANCE STORE / HOME FIXTURES -ATTACHED

For Card Not Present Transactions – Merchandise is delivered
☒ Physical ☐ Electronic ☐ Both

Average number of days from when cardholder is charged & when products or services are received IN FULL by cardholder? 90

| Average ticket $2500 |
| High ticket $99,999 |

Warranties Provided by Merchant (excluding manufacturer warranties):
☒ None ☐ 30-Day ☐ 60-Day ☐ 90-Day ☐ 1-Year ☐ Lifetime

Return Policy: ☐ None ☐ 3-Day ☐ 30-Day ☐ 60-Day
☒ >60 Days ☐ All Sales Final ☐ Exchange/Store Credit Only

| Chargeback Percentage 0 % | Card Swiped 20 % + | Business to Business 10 % |
| Return Percentage 1 % | Manual with Imprint 0 % + | Internet Transaction 0 % |
| | Manual with No Imprint 80 % = 100% | Website (required for Internet sales) www.Pirch.com |

| Visa/MC/Discover volume related to pre-paid Sales? 20 % | Estimated Total V/MC/discover Monthly Volume $ 8,333,333 |
| Percentage Required for Pre-Payment or Down Payment? 20 % | Estimated Total American Express Monthly Volume $ 6,666,666 |
| American Express volume related to pre-paid Sales? 20 % | |

X_____ By initialing here, I am electing to opt out of receiving American Express Marketing Materials.

Has this Business, or any of its predecessors or affiliates, ever been fined by Visa® or MasterCard® Discover® or American Express®? ☐ Yes ☒ No.
If Yes, ☐ Visa® ☐ MasterCard® ☐ Discover® ☐ American Express®

## SITE VISIT

☐ Merchant proceeds deposited into Member Bank account      ☐ Not required due to Franchise or Association exception
☐ Personal visit by a sales representative      Date
☐ Was site consistent with Merchant's represented business? ☐ Yes ☐ No
☐ Inspection report completed by other Processor employee and included with supporting documentation
☐ Interior and exterior photos of the Merchant's location are attached.

## Bank Card Merchant Agreement/Application

9.2015

### General Terms and Certification

- This "Bank Card Merchant Agreement and Application" (herein collectively "**Agreement**") consists of the following component parts all of which are incorporated by reference herein and constitute the entire agreement between the parties and supersede all prior agreements or representations between the parties whether written or oral with respect to the subject matter herein: (1) the Bank Card Merchant Agreement/Application, (2) the Bank Card Merchant Agreement, (3) Merchant Price Schedule and (4) any and all other applicable addenda, schedules, exhibits, attachments, or amendments thereto. Unless otherwise explicitly stated, all capitalized terms that are used but not defined in this paragraph have the meanings specified in the Agreement. Each person signing immediately below this paragraph (each, as "Signer") certifies that (i) he or she is an officer, owner, principal, or other authorized representative of the Merchant identified on page 1 of the Agreement (the "Merchant"), AND (ii) all of the information contained herein is true, accurate, and complete, AND (iii) he or she has been provided a full and complete copy of this Agreement, AND (iv) that he or she has read, understands, and accepts all of the terms and conditions contained in this paragraph and elsewhere within the Bank Card Merchant Agreement/Application.
- No modification, alterations, or manual changes (including lining out fees, unless otherwise pre-approved and/or pre-designated by Processor) made by Merchant to the Agreement shall have any force or effect unless and until such modifications or alterations are expressly consented to in writing by Processor. This Agreement may be executed in counterparts and a scanned, facsimile, or duplicate copy of this Agreement executed by the parties shall be treated as and/or constitute an original. Each undersigned below warrants and represents that he or she is a duly authorized representative of the legal entity on behalf of which he or she is executing this Agreement. **By signing below, Signer(s), on behalf of the Merchant, (i) agrees to be bound by all of the provisions of the Agreement, including without limitation, the choice of law, jurisdiction, and venue provisions contained in the Terms and Conditions, and (ii) acknowledges Merchant is aware of and must comply with the Rules Summary, Operating Regulations and Merchant Operating Requirements.**
- Signer(s) further individually authorizes Processor or its representative to investigate him, her or Merchant by utilizing a third-party credit reporting agency and conducting an initial and ongoing comprehensive credit inquiry and/or investigation. In the event Merchant is not approved by Processor for the provision of services under the Agreement, Signers), on Merchant's behalf, authorizes Processor to share all information provided herein with Processor's strategic partner for the possible provision of substantially similar services.
- Signer(s), on behalf of the Merchant, irrevocably authorizes Processor to initiate Automated Clearing House ("ACH") debit and/or credit entries from and to the Designated Accounts for all fees, costs, and amounts due to Processor or payable to Merchant pursuant to this Agreement and ACH rules and regulations. In the event that a credit or debit entry is erroneously initiated, Signer(s), on behalf of the Merchant, authorizes Processor immediately to correct such error. This ACH Authorization shall remain in full force and effect until Processor has collected payment on all fees, costs, and amounts due or which may become due pursuant to this Agreement. The Designated Account(s) may not be changed or altered without thirty (30) days prior written notification to Processor and the execution of any forms or instruments deemed reasonably necessary by Processor.
- Signer(s) certifies under penalties of perjury that:
  **1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and**
  **2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and**
  **3. I am a U.S. citizen or other U.S. person**

### FINANCIAL INFORMATION

☐ SUBMITTING BUSINESS FINANCIALS          ☐ PERSONAL GUARANTEE (if checked, attach UPG)

- Each Signer to the Agreement further individually authorizes Processor or its representative to investigate him, her or Merchant by utilizing a third-party credit reporting agency and conducting an initial and ongoing comprehensive credit inquiry and/or investigation. In the event that Merchant is not approved by Processor for the provision of services under the Agreement, each Signer, on Merchant's behalf, authorizes Processor to share all information provided herein with Processor's strategic partner for the possible provision of substantially similar services.

### LIMITED CARD ACCEPTANCE

☐ I elect to be a Limited Acceptance Merchant, meaning I choose to accept the indicated VISA/MasterCard® card types below:
**To be a limited card type acceptance merchant, Merchant must indicate which card types are going to be accepted by marking the appropriate box(es):**

☐ Visa Credit and Business Cards                    ☐ Visa Debit Cards
☐ MasterCard Credit and Business Cards          ☐ MasterCard Debit Cards

Please see section 37 of the Terms and Conditions for further detail on Limited Acceptance and Merchant responsibilities.
Unless indicated otherwise above, Merchant agrees to **accept all** Visa® and MasterCard® Card Types.

### MERCHANT PROCESSING AGREEMENT ACKNOWLEDGEMENT

Merchant acknowledges receipt of the Bank Card Merchant Agreement, the application thereto, the Price Schedule, and any and all other applicable amendments, schedules, exhibits, and attachments, including without limitation, the documents listed below. Merchant has read, understands and agrees to be bound by the Agreement, as may be amended from time to time in accordance therewith. If Member Bank and/or Processor agree to provide services to Merchant, submission of any transactions or items to Member Bank, Processor, or its third party providers constitutes consent to the Agreement Terms And Conditions and the terms and conditions related to any other service Merchant has elected to receive. Merchant can request a copy of the Agreement at any time by contacting a Customer Service Representative at (866) 622-2390 or Relationship Manager.
- Addendum A – General Services Addendum
- Tiered Enhanced Surcharge schedules
- Network Interchange Schedules(as applicable)
- Rules Summary
- Privacy Notice

| | SIGNATURE | PRINTED NAME | INITIAL HERE | TITLE | DATE |
|---|---|---|---|---|---|
| 1 | *[signature]* | David G. Robson | *cm* | CFO | 11/6/15 |
| 2 | SIGNATURE | PRINTED NAME | INITIAL HERE | TITLE | DATE |

| Sales Representative Signature *[signature]* | PRINTED NAME MATTHEW B HAUSSMANN | DATE 11/6/2015 |
|---|---|---|

MEMBER BANK: FIFTH THIRD BANK , AN OHIO BANKING CORPORATION, LOCATED AT 38 FOUNTAIN SQUARE PLAZA, CINCINNATI, OH 45263



**BANK CARD MERCHANT AGREEMENT**

9.2015-VNTV

This Bank Card Merchant Agreement is made among VANTIV, LLC ("Processor") having its principal office at 8500 Governors Hill Drive, Symmes Township, OH 45249-1384, the Member Bank and **PIRCH, INC** ("Merchant") having its principal office at **9620 Towne Centre Drive, Suite 100 San Diego CA 82121**. Processor, Member Bank and Merchant hereby agree as follows:

I.  Processor and/or Member Bank participates in programs affiliated with MasterCard, VISA, Discover, and Other Networks which enable holders of Cards to purchase goods and services from selected merchants located in the United States by use of their Cards.

II.  Merchant wishes to participate in the MasterCard, VISA, Discover, and the Other Networks systems at its United States locations by entering into contracts with Cardholders for the sale of goods and services through the use of Cards.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual promises hereinafter set forth, the parties agree as follows:

**1.  Definitions.**

For the purposes of this Agreement, the following terms shall have the meanings set forth below:

<u>Account</u> shall mean an open checking account at Fifth Third Bank or its affiliate, or at another financial institution acceptable to Processor which Processor or its agent can access through the ACH system.

<u>Account Change</u> means a change in the Account or the financial institution where the Account is located.

<u>ACH</u> shall mean the Federal Reserve's Automated Clearing House ("ACH") system.

<u>Agreement</u> means this Bank Card Merchant Agreement, the Merchant Price Schedule, and each exhibit, schedule, and addendum attached hereto or referencing this Agreement, as well as all documents and other materials incorporated herein by reference.

<u>Association</u> means VISA, MasterCard, Discover, or any Other Network, as the same are defined herein.

<u>Rules Summary</u> means the Bank Card Merchant Rules and Regulations, which are incorporated into this Agreement by reference

<u>Cards</u> shall mean MasterCard, VISA, Discover and Other Network cards, account numbers assigned to a cardholder, or other methods of payment accepted by Processor, for which pricing is set forth in the Agreement.

<u>Cardholder</u> shall mean any person authorized to use the Cards or the accounts established in connection with the Cards.

<u>Data Incident</u> shall mean any alleged or actual compromise, unauthorized access, disclosure, theft, or unauthorized use of Card or Cardholder information, regardless of cause, including without limitation, a breach of or intrusion into any system, or failure, malfunction, inadequacy, or error affecting any server, wherever located, or hardware or software of any system, through which Card information resides, passes through, and/or could have been compromised.

<u>Discover</u> shall mean Discover Financial Services, LLC.

<u>Event of Default</u> shall mean each event listed in Section 13.

<u>Float Event</u> shall mean a circumstance where Processor, for whatever reason, advances settlement or any amounts and/or delays the assessment of any fees.

<u>Force Majeure Event</u> shall mean, labor disputes, fire, weather or other casualty, power outages, and funding delays, however caused, governmental orders or regulations, or any other cause, whether similar or dissimilar to the foregoing, beyond Processor's reasonable control.

<u>Initial Term</u> shall mean 2 years from the 1st day of the calendar month following the later of the date Processor executes this Agreement or the first date that all of Merchant's locations receive the Services from Processor.

<u>Member Bank</u> shall mean a member of VISA, MasterCard and/or Other Networks, as applicable, that provides sponsorship services in connection with this Agreement. As of the commencement of this Agreement, the Member Bank shall be Fifth Third Bank, an Ohio banking corporation.

<u>Service Delivery Process</u> means Processor's then standard methods of communication, service and support, including but not limited to communication via an online Merchant portal, email communication, statement notices, other written communications, etc.

<u>Merchant Supplier</u> shall mean a third party other than Processor or Member Bank used by Merchant in connection with the Services received hereunder, including but not limited to, Merchant's software providers, equipment providers, and/or third party processors.

<u>MasterCard</u> shall mean MasterCard International, Inc.

<u>Operating Regulations</u> means the by-laws, operating regulations and/or all other rules, policies and procedures of VISA, MasterCard, Discover, and/or Other Networks as in effect from time to time.

<u>Other Network</u> shall mean any network or card association other than VISA, MasterCard, or Discover that is identified in the Merchant Price Schedule and in which Merchant participates hereunder.

<u>PCI</u> shall mean the Payment Card Industry Data Security Standard.

<u>Service</u> shall mean any and all services described in, and provided by Processor pursuant to, this Agreement.

<u>VISA</u> shall mean VISA USA, Inc.

Other defined terms and Services applicable to this Agreement will be contained in a "General Services Addendum" as described herein.

**2.  Rules Summary; Operating Regulations; General Services Addendum.** Merchant acknowledges receipt and review of the Rules Summary, which are incorporated into this Agreement by reference. Merchant (and Processor, as applicable) agrees to fully comply with all of the terms and obligations in the then current Rules Summary, as changed or updated by Processor from time to time, at Processor's sole reasonable discretion with notice in accordance with the Service Delivery Process. The Rules Summary is a summary of key Operating Regulations that govern this Agreement. In the event there is a change in the Rules Summary by Processor that is not related to or based on a corresponding Association rule or requirement, such provision will not be binding on Merchant. Merchant (and Processor, as applicable) agrees to participate in the Associations in compliance with, and subject to, the Operating Regulations. Without limiting the foregoing, Merchant (and Processor, as applicable) agrees that it will fully comply with any and all confidentiality and security requirements of the USA Patriot Act (or similar law, rule or regulation), VISA, MasterCard, Discover, and/or Other Networks, including but not limited to PCI, the VISA Cardholder Information Security Program, the MasterCard Site Data Protection Program, and any other program or requirement that may be published and/or mandated by the Associations. Notwithstanding Processor's assistance in understanding the Operating Regulations, Merchant expressly acknowledges and agrees that it is assuming the risk of compliance with all provisions of the Operating Regulations, regardless of whether Merchant has possession of those provisions. Both MasterCard and VISA make excerpts of their respective Operating Regulations available on their internet sites. Merchant acknowledges responsibility for any liability resulting from its decision not to participate in optional Association programs, including but not limited to any increased Data Incident liability resulting from its decision not to participate in an Association EMV program. In the event Merchant chooses to participate in an optional Association program, including but not limited to an EMV program, Merchant acknowledges and agrees that it shall be responsible for (i) ensuring compliance with any applicable program requirements and/or Operating Regulations applicable to such program, including but not limited to making any updates to its point of sale equipment and (ii) any cost associated with its participation in the applicable program, including any costs assessed to Merchant by

SD\1649311.2

Processor. Other Services applicable to this Agreement will be contained in the General Services Addendum as may be published and modified from time to time by Processor and the parties agree that such Addendum shall be incorporated into and made part of this Agreement and that such Addendum shall apply only with respect to those Services actually provided by Processor and received by Merchant hereunder. Merchant acknowledges receipt and review of the General Services Addendum. In the event of a conflict between the fees set forth on the Merchant Price Schedule and the General Services Addendum, the Merchant Price Schedule shall control.

**3. Application; Change in Business.** Merchant represents that all information supplied by Merchant in connection with its application or other request for services is complete and accurate. In accordance with Section 326 of the USA Patriot Act, Processor is required to review and record information from the documents used in identifying new merchant customers. The preceding sentence is intended to inform Merchant of Processor's procedures and of Processor's responsibility under the USA Patriot Act. Merchant agrees to provide Processor with 30 days prior written notice of Merchant's intent to change its business form or entity in any manner (e.g. a change from a limited liability company to a corporation), and/or of Merchant's intent to sell its stock or assets to another entity.

**4. Card Acceptance.** Merchant must accept all Cards and complete all Card transactions in accordance with the Operating Regulations. In the event Processor for whatever reason is unable to obtain, or due to system delays chooses not to wait to obtain, authorization from an Association, Processor may at its option "stand-in" for such entities and authorize the sales transaction based on criteria established by Processor, and Merchant remains responsible for such sales transaction in accordance with this Agreement. Merchant has identified to Processor the products and/or services for which it intends to accept Cards as payment. Merchant agrees that it shall only complete and deliver to Processor sales transactions produced as the direct result of bona fide sales made by Merchant to Cardholders for such identified products and/or services, unless otherwise agreed by Processor in writing

**5. Transaction Processing.** Processor or Member Bank will initiate payment to Merchant of the total face amount of each sales transaction acquired and accepted hereunder, subject to the terms and conditions of this Agreement, the Operating Regulations, and applicable law, after Processor receives payment for such sales transactions. Unless otherwise agreed to in writing by Processor, Merchant shall electronically deliver to Processor and in a format acceptable to Processor all credit vouchers and sales transaction records within two (2) business days after the applicable transaction date (or such shorter period as determined by the applicable Association), except (i) in the case of a delayed merchandise delivery, when the sales transaction record shall be delivered within two (2) business days of the merchandise delivery or (ii) as specified otherwise in the Operating Regulations. Merchant agrees that it shall deliver sales transaction records to Processor at least every business day. The preparation and delivery to Processor by Merchant of sales transactions shall constitute an endorsement to Processor by Merchant of each sales transaction, and Merchant authorizes Processor or its representative to place Merchant's endorsement on any sales transaction at any time. Processor may refuse to acquire any sales transaction or claim the amount of which, in whole or in part, it could charge back to the Merchant pursuant to this Agreement, if it had acquired the sales transaction or claim. Merchant acknowledges and agrees that Processor is not responsible for any action or inaction taken by the financial institution or other entity that issued the Card(s) to the Cardholder or the processor of such Card(s). Merchant agrees that Processor may set off any amounts due to Processor from amounts owed to Merchant, including but not limited to any amounts owed to Merchant from Processor and/or any of its affiliate(s).

**6. Exception Items.** Merchant agrees to reacquire and pay Processor the amount of any sales transaction, and Processor shall have the right at any time to charge Merchant's Account therefore with notice via Processor's Service Delivery Process, for any return, chargeback, compliance case, any other Association action, or if the extension of credit for merchandise sold or services or sales transactions performed was in violation of law or the rules or regulations of any governmental agency, federal, state, local or otherwise; or if

Processor has not received payment for any sales transaction, notwithstanding Processor's prior payment to Merchant for such sales transaction pursuant to Section 5 above or any other section. Not limiting the generality of the foregoing, Merchant agrees that any operational and/or other Services performed on behalf of Merchant, including but not limited to, production of facsimile drafts in response to copy requests, response to compliance cases, augmentation of Merchant data for interchange, transaction stand-in, digital draft storage and retrieval, etc. shall in no way affect Merchant's obligations and liability in this Agreement including those in the foregoing sentence. Merchant may instruct Processor in the defense of chargebacks, compliance cases and similar actions, and Merchant agrees that it will promptly provide any such instructions to Processor. When Processor has determined it has all necessary information and instructions, Merchant hereby authorizes Processor to resolve chargebacks and respond to retrieval requests and other inquiries without further consulting Merchant.

**7. Merchant Suppliers.** Merchant may use one or more Merchant Suppliers in connection with the Services and/or the processing of some or all of its Card transactions. In no event shall Merchant use a Merchant Supplier unless such Merchant Supplier is compliant with PCI and/or the Payment Application Data Security Standard ("PA-DSS"), depending on the type of Merchant Supplier, as required by the Operating Regulations. Merchant acknowledges and agrees that Merchant shall cause its Merchant Supplier to complete any steps or certifications required by any Association (e.g., registrations, PA-DSS, PCI, audits, etc.). Merchant shall cause its Merchant Supplier to cooperate with Processor in completing any such steps or certifications (if applicable), and in performing any necessary due diligence on such Merchant Supplier. Merchant shall be solely responsible for any and all applicable fees, costs, expenses and liabilities associated with such steps, registrations, and certifications. Merchant shall bear all risk and responsibility for conducting Merchant's own due diligence regarding the fitness of any Merchant Supplier(s) for a particular purpose and for determining the extent of such Merchant Supplier's compliance with the Operating Regulations and applicable law. Merchant expressly agrees that Processor shall in no event be liable to Merchant or any third party for any actions or inactions of any Merchant Supplier used by Merchant, even if Processor introduced and/or recommended the use of such Merchant Supplier to Merchant, or never objected to the use of such Merchant Supplier, and Merchant hereby expressly assumes all such liability.

**8. Cardholder Information.** Merchant shall not disclose, sell, purchase, provide, or exchange Cardholder name, address, account number or other information to any third party other than to Processor or an Association for the purpose of completing a sales transaction unless specifically permitted by the Operating Regulations. Merchant represents and warrants that neither it nor its Merchant Supplier shall retain or store any portion of the magnetic-stripe data subsequent to the authorization of a sales transaction, nor any other data prohibited by the Operating Regulations and/or this Agreement.

Processor acknowledges responsibility for payment card data on its proprietary systems. Processor will (i) maintain its PCI-DSS certification and (ii) be validated as a PCI-DSS compliant service provider. In the event Processor is deemed not to be in compliance with PCI-DSS, Processor shall make commercially reasonable efforts to become compliant and maintain compliance thereafter; provided, however, that should Processor fail at any time to maintain compliance subject to the cure period set forth in Section 14 hereof, Merchant may terminate this Agreement immediately upon written notice to Processor. As of the execution of the Agreement, PCI-DSS information and standards can be found at the Payment Card Industry Security Council website at https://www.pcisecuritystandards.org/index.htm.

**9. Term.** The term of this Agreement shall commence the date Processor executes this Agreement, and shall continue for the Initial Term as defined in Section 1 of this Agreement. Except as hereafter provided, unless either party gives written notice to the other party at least 60 days prior to the expiration of any term, the Agreement including all addenda, schedules and exhibits hereto or referencing this Agreement shall be automatically for periods equal to one year. All obligations of Merchant incurred or existing under this Agreement as of the date of termination, shall survive such termination.

SD\1649311.2

**10. Processor Fees.** Merchant agrees to pay Processor the fees, expenses and all other amounts set forth in the Agreement including, but not limited to, the Merchant Price Schedule. Processor may change or add fees and/or charges upon notice to Merchant via Processor's Service Delivery Process, and such fees and/or charges shall be immediately payable by Merchant when assessed by Processor. In the event Processor changes or adds its fees and/or charges pursuant to the immediately preceding sentence ("Fee Change"), Merchant may, subject to the following provisions, terminate the Agreement upon 30 days advance written notice to Processor provided Processor receives such written notice from Merchant of its intention to so terminate within 120 days of the date the Fee Change becomes effective, and such Fee Change shall not apply to Merchant. Upon Processor's receipt of Merchant's written notice pursuant to the immediately preceding sentence, Processor shall have 10 days to rescind or waive the Fee Change, and, in the event Processor elects to rescind or waive the Fee Change, Merchant shall not have the right to terminate this Agreement as a result of the Fee Change and this Agreement shall remain in full force and effect notwithstanding Merchant's written notice to terminate. Merchant acknowledges and agrees that this Section shall not be intended or construed to permit Merchant to terminate the Agreement as a result of a change or increase in fees from third parties and/or in pass through fees as referenced in this Agreement or the Merchant Price Schedule. At Merchant's request, Processor may, in its sole discretion, establish multiple Merchant billing definitions on its system, and in such event Processor shall assess all applicable fees separately and independently with respect to each such billing definition.

**11. Third Party Assessments.** Notwithstanding any other provision of this Agreement, Merchant shall be responsible for all amounts imposed or assessed to Merchant and/or Processor in connection with this agreement by third parties such as, but not limited to, Associations and Merchant Suppliers (including telecommunication companies), to the extent that such amounts are not the direct result of the gross negligence or willful misconduct of Processor. Such amounts include, but are not limited to, fees, fines, assessments, penalties, loss allocations, etc. Any changes or increases in such amounts shall automatically become effective upon notice to Merchant via Processor's Service Delivery Process and shall be immediately payable by Merchant when assessed by Processor. In the event of a Float Event, Processor reserves the right to assess to Merchant, and Merchant shall pay to Processor, a cost of funds associated with the Float Event (which Processor may at its option assess as a transaction surcharge), the amount of which shall be determined by Processor in its reasonable discretion, and which may be changed by Processor from time to time, and such cost of funds shall be effective as of the start of the Float Event and shall be immediately payable by Merchant when assessed by Processor.

**12. Exclusivity.** Processor and Member Bank reserve the right to enter into other agreements pertaining to the Services with others including without limitation other merchants. The parties agree that Processor shall be the exclusive provider of the Services to Merchant for its showroom, website and fulfilment center transaction volume. Processor agrees that Merchant may use another provider as necessary at its mobile events and trade shows provided, however, Processor remains Merchant's preferred provider and such transaction volume does not exceed 5,000,000 per year.

**13. Default.** The following events shall be considered an "Event of Default":
(i) Merchant becomes subject to any voluntary or involuntary bankruptcy, insolvency, reorganization or liquidation proceeding, a receiver is appointed for Merchant, or Merchant makes an assignment for the benefit of creditors, or admits its inability to pay its debts as they become due; or
(ii) Merchant fails to pay or reimburse the fees, expenses or charges referenced herein when they become due; or
(iii) Merchant is in default of any terms or conditions of this Agreement whether by reason of its own action or inaction or that of another; or
(iv) Processor reasonably believes that there has been a material deterioration in Merchant's financial condition; or
(v) any standby letter of credit, if and as may be required pursuant to Section 20, will be cancelled, will not be renewed, or is not in full force and effect; or
(vi) Merchant ceases to do business as a going concern, or there is a change in ownership of Merchant which changes the identity of any

person or entity having, directly or indirectly, more than 30% of either the legal or beneficial ownership of Merchant.

Upon the occurrence of an Event of Default, Processor may at any time thereafter terminate this Agreement by giving Merchant written notice thereof. However, except in instances where immediate termination is required by any Association or if Member Bank and/or Processor reasonably believe that the Event of Default poses material risk to either of them or involves a violation of applicable law, Merchant will have 30 days following Processor's notice to cure an Event of Default under Section (ii), (iii), (iv) or (v) prior to termination under this section. Termination of Merchant for any reason shall not relieve Merchant from any liability or obligation to Processor. If, prior to the date on which the then current term of this Agreement is scheduled to expire, either this Agreement is terminated by Processor for an Event of Default as described in roman numerals (ii) or (iii) of this Section, or Merchant for any reason discontinues receiving the Services from Processor (except as may be specifically permitted by this Agreement), Merchant shall be liable to Processor liquidated damages in an amount equal to the average monthly revenue (which does not include interchange and other Association fees) payable to Processor as a result of this Agreement for the preceding 12 calendar months, or such shorter period if this Agreement has not been in effect for 12 months, multiplied by the lesser of (a) 6 months, or (b) number of months remaining during the then current term of this Agreement. Merchant recognizes and agrees that the liquidated damages are fair and reasonable because it is not possible to establish the actual increase in volume and activity by Merchant during the term of this Agreement. Merchant shall also reimburse Processor for any damage, loss or expense incurred by Processor as a result of a breach by Merchant, including any damages set forth in any addendum and/or schedule and/or exhibit hereto and including all past due, unpaid and/or future invoices for services rendered by Processor in connection with this Agreement. All such amounts shall be due and payable by Merchant upon demand. Processor shall also have the option to require Merchant to reacquire all outstanding sales transactions acquired by Processor hereunder. In addition to, and not in limitation of the foregoing, Processor may refuse to provide the Services in the event it has not been paid for the Services as provided herein.

**14. Processor Nonperformance:** Processor shall be in default under this Agreement ("Processor Default") if: (i) Processor becomes subject to any voluntary or involuntary bankruptcy, insolvency, reorganization or liquidation proceeding, a receiver is appointed for Processor, or Processor makes an assignment for benefit of creditors, or admits its inability to pay its debts as they become due; or (ii) Processor fails to pay settlement funds to Merchant when due; or (iii) Processor is in default of any material terms or conditions of this Agreement; or (iv) Processor ceases to do business as a going concern. Upon the occurrence of a Processor Default, and Processor's failure to cure the same within 30 days of the Processor's receipt of written notice from Merchant specifically describing the Processor Default and the date on which the Processor Default first occurred, Merchant may thereafter terminate this Agreement by giving Processor 30 days written notice thereof, provided Processor actually receives such notice of termination within 90 days after the end of such cure period.

**15. Taxes.** Any sales, use, excise or other taxes (other than Processor's income taxes) payable in connection with or attributable to the Services provided to the Merchant per this Agreement shall be paid by Merchant. Processor may, but shall not have the obligation to, pay such taxes In the event Processor pays such taxes, Merchant shall immediately reimburse Processor or Processor may, at Processor's sole option, charge Merchant's Account.

**16. Binding on Successors; Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, administrators, successors, transferees and assignees. Neither party may assign or transfer this Agreement or any interest herein, in whole or in part, without the other party's prior written consent, which will not be unreasonably delayed or withheld provided, however, that Processor may, upon notice to Merchant assign its rights and obligations under this Agreement to a parent, subsidiary or affiliate, or to a successor-in-interest of all or substantially all of its assets or equity securities without the consent of Merchant. Merchant will remain liable for any amounts owed under this Agreement after an unauthorized transfer or assignment by Merchant,

SD\1649311.2

even if Processor continues to provide Services to such transferee or assignee. This Agreement is for the benefit of, and may be enforced only by, Processor and Merchant and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party.

**17. Notices.** All notices, requests, demands and other communications to be delivered hereunder unless specified otherwise herein shall be in writing and shall be delivered by nationally recognized overnight carrier, registered or certified mail, postage prepaid, to the following addresses:

(i) if to Processor: Vantiv, LLC, 8500 Governors Hill Drive, Mail Drop 1GH1Y1, Symmes Township, OH 45249-1384, Attention: General Counsel/Legal Department;

(ii) if to Merchant: to the Merchant address provided above, Attention President/Owner; or to such other address or to such other person as either party shall have last designated by written notice to the other party.

Notices, etc., so delivered shall be deemed given upon receipt.

**18. Unenforceable Provision.** If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

**19. Payment.** Merchant shall always maintain an open Account. Merchant irrevocably authorizes Processor to debit and/or credit the Account to settle any and all fees and other amounts due Processor under this Agreement, and such authority shall remain in effect for a period of one (1) calendar year following the date of termination of this Agreement, regardless of whether Merchant has notified Processor of an Account Change as defined below. Merchant shall always maintain the Account with sufficient cleared funds to meet its obligations under this Agreement. In the event Merchant desires an Account Change, Merchant shall give Processor 30 days prior written notice in accordance with the provisions of Section 17 of any such change, and Processor shall use reasonable commercial efforts to effect such Account Change; however, such Account Change shall not be effective until the date on which Processor actually makes such Account Change on Processor's system. In no event shall Processor have any liability for any amounts directed to an Account that has been designated by any purported representative of Merchant or its Merchant Supplier at any time during the term of this Agreement, regardless of any Account Change. All amounts due Processor under this Agreement shall be paid without set-off or deduction, and shall be due from Merchant as of the date Processor originates an ACH debit transaction record to Merchant's Account. Any fees not collected from Merchant by Processor when due shall bear interest at one (1) percentage point per month but in no event more than the highest rate permitted by law. The acceptance by Processor, Processor's affiliate or other financial institution of Merchant's closing (or termination of) its Account shall not constitute a mutually agreed upon termination of this Agreement. Without limiting the generality of any other provision of this Agreement, Processor and/or Member Bank are hereby authorized by Merchant to charge amounts due under this Agreement i) against each day's sales transactions ii) against any reserve; or iii) by making an ACH debit to Merchant's Account.

**20. Reserve; Letter of Credit.** As a specifically bargained for inducement for Processor to enter in this Agreement with Merchant, Processor, at its option, reserves the right to i) establish from amounts payable to Merchant hereunder, and/or cause Merchant to pay to Processor, a reserve of funds satisfactory to Processor to cover actual or anticipated fees, liabilities, chargebacks, returns and any other applicable assessments incurred or expected to be incurred by Processor or Member Bank related to the Services provided to Merchant; and/or ii) require Merchant to establish an irrevocable standby letter of credit, including additional and/or replacement letters of credit if required by Processor, with a beneficiary designated by Processor, and which are issued from a financial institution other than Member Bank or any of its affiliates, that is acceptable to Processor, in a format, with an expiration date, and in an amount acceptable to Processor in its sole discretion. In the event Merchant fails to establish, for any reason whatsoever, a reserve and/or letter of credit as required above, Processor shall have all

of the rights and remedies available to Processor in this Agreement, including but not limited to exercising the rights and remedies of Processor in Section 13. In the vent Processor exercises its right to establish a reserve or require a letter of credit pursuant to this Section, Merchant may, subject to the following provisions, terminate the Agreement upon 30 days advance written notice to Processor provided Processor receives such written notice from Merchant of its intention to so terminate within 90 day s of the date on which Processor establishes the reserve or requires the letter of credit. Upon Processor's receipt of Merchant's written notice pursuant to the immediately preceding sentence, Processor may, at its option, return the reserve to Merchant or waive the requirement for a letter of credit, and, in the event Processor elects to return the reserve to Merchant or waive the requirement for a letter of credit, Merchant shall not have the right to terminate this Agreement pursuant to this Section and this Agreement shall remain in full force and effect notwithstanding Merchant's written notice to terminate. Processor represents to Merchant that it has no intention of requiring a reserve or letter of credit immediately upon execution of this Agreement. Processor will not require a reserve or letter of credit hereunder unless Processor, in its commercially reasonable judgment, believes its exposure under this Agreement is outside of Processor's standard risk policy. Any such reserve or letter of credit shall be limited to an amount reasonably calculated to cover anticipated fees, fines, Chargebacks and returns.

Merchant shall not sell, assign, transfer or encumber all or any part of its interest in the reserve account, if any, or any present or future rights under this Agreement, including but not limited to, Merchant's right to receive any payments or funds. Neither Processor nor Member Bank shall be obligated to honor any such purported attempt to sell, assign, transfer or encumber such interest, rights, payments or funds unless both Processor and Member Bank consent in writing. In the event Merchant breaches this paragraph, then, in addition to any other rights and remedies Processor may have under this Agreement and otherwise, Processor shall have the right, at its option, to withhold any or all funds or payments which would otherwise be payable to Merchant under this Agreement until it shall have received instructions concerning the disposition of such payments or funds, satisfactory in form and substance to Processor and signed by both Merchant and any purported assignee. Merchant shall indemnify Processor and hold it harmless from and against any and all claims, liabilities and damages which may be asserted against Processor by any purported assignee or any other person arising out of Merchant's purported sale, assignment, transfer or encumbrance of all or any of Merchant's present or future rights under this Agreement.

**21. Indemnification.**
A. Subject to the other limitations, terms and conditions of this Agreement, Processor shall indemnify, defend, and hold harmless Merchant, and its directors, officers, employees, affiliates and agents from and against all third party proceedings, claims, losses, damages, demands, liabilities and expenses whatsoever, including all reasonable legal and accounting fees and expenses and all reasonable collection costs, incurred by Merchant, its directors, officers, employees, affiliates and agents to the extent resulting from or arising out of Processor's breach of this Agreement, gross negligence, or willful misconduct.

B. Subject to the other limitations, terms and conditions of this Agreement, except to the extent caused by Processor's gross negligence or willful misconduct, Merchant shall indemnify, defend, and hold harmless Processor, and its directors, officers, employees, affiliates and agents from and against all proceedings, claims, losses, damages, demands, liabilities and expenses whatsoever, including all reasonable legal and accounting fees and expenses and all reasonable collection costs, incurred by Processor, its directors, officers, employees, affiliates and agents resulting from or arising out of the Services in this Agreement, Merchant's processing activities, the business of Merchant or its customers, any sales transaction acquired by Processor, any noncompliance with the Operating Regulations (or any rules or regulations promulgated by or in conjunction with the Associations) by Merchant or its agent (including any Merchant Supplier), any Data Incident, any infiltration, hack, breach, or violation of the processing system of Merchant, its Merchant Supplier, or any other third party processor or system, or by reason of any breach or

nonperformance of any provision of this Agreement on the part of the Merchant, or its employees, agents, Merchant Suppliers, or customers.

C. The indemnification of each party shall survive the termination of the Agreement. The indemnified party shall (i) provide prompt written notice of any claim to the indemnifying party; (ii) cooperate with all reasonable requests of the indemnifying party; and (iii) surrender exclusive control of the defense and settlement of any third party claim to the indemnifying party provided that the indemnifying party will obtain the indemnified party's written consent prior to agreeing to any settlement or agreement that requires the indemnified party to make any admission of fault or to pay any amounts in connection with such settlement or agreement that are not fully paid for by the indemnifying party. The indemnified party shall not unreasonably withhold or delay any consent required under this Section. The indemnified party may elect to participate in the action with an attorney of its own choice at its own expense.

**22. Review of Settlement Activity and Reports; Notice of Failure by Processor.** Merchant agrees that it shall review all reports, notices, and invoices prepared by Processor or its agent and made available to Merchant, including but not limited to reports, notices, and invoices provided via Processor's online reporting tool. Processor reserves the right to send some or all of the reports and/or invoices and/or notices of any pricing changes permitted under this Agreement via communication methods utilized as components of its Service Delivery Process which method Processor may change from time to time with notice via Processor's Service Delivery Process. Merchant expressly agrees that Merchant's failure to notify Processor that Merchant has not received any settlement funds within five business days from the date that settlement was due to occur, or fails to reject any report, notice, or invoice within thirty business days from the date the report or invoice is made available to Merchant, shall constitute Merchant's acceptance of the same. In the event Merchant believes that Processor has failed in any way to provide the Services, Merchant agrees to provide Processor with written notice, specifically detailing any alleged failure, within 30 days of the date on which the alleged failure first occurred.

**23. Choice of Law; Jurisdiction; Venue.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio without regard to conflicts of law provisions. The parties hereby consent and submit to service of process, personal jurisdiction, and venue in the state and federal courts in Cincinnati, Ohio or Hamilton County, Ohio, and select such courts as the exclusive forum with respect to any action or proceeding arising out of or in any way relating to this Agreement, and/or pertaining in any way to the relationship between Merchant and Processor. MERCHANT AND PROCESSOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY MATTER UNDER, RELATED TO, OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS OR RELATIONSHIPS CONTEMPLATED HEREBY.

**24. Limit of Liability; Force Majeure.**

A. EXCEPT FOR THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, PROCESSOR DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. MERCHANT HEREBY ACKNOWLEDGES THAT THERE ARE RISKS ASSOCIATED WITH THE ACCEPTANCE OF CARDS AND MERCHANT HEREBY ASSUMES ALL SUCH RISKS EXCEPT AS MAY BE EXPRESSLY SET FORTH HEREIN.
B. Without limiting the foregoing, neither party shall be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by the other party) suffered by such party, its customers, or any third party in connection with the Services provided hereunder. However, nothing in the foregoing sentence is in any way intended, and shall not be construed, to limit (i) Merchant's obligation to pay any fees, assessments or penalties due under this Agreement, including but not limited to those imposed by telecommunications services providers, VISA, MasterCard and/or Other Networks; or (ii) any damages due from Merchant related to an early termination of this Agreement; or (iii) any damages due from Merchant related to the failure by Merchant to exclusively receive the Services from Processor to the extent required by the Agreement, and/or (iv) Merchant's

obligation to indemnify Processor pursuant to section 21 .In no event shall Processor be liable for any damages or losses (i) that are wholly or partially caused by the Merchant, or its employees, agents, or Merchant Suppliers that should have been reported to Processor pursuant to Section 22, (ii) that first occurred, whether or not discovered by Merchant, more than 30 days prior to Processor's receipt of written notice from Merchant or (iii) that were caused due to errors in data provided by Merchant to Processor.
C. Processor's liability related to or arising out of this Agreement shall in no event exceed an amount equal to the lesser of (i) actual monetary damages incurred by Merchant or (ii) fees paid to and retained by Processor for the particular Services in question for the three calendar months immediately preceding the date on which Processor received a written notice from Merchant detailing Processor's material nonperformance under this Agreement. For avoidance of doubt, the cap on Processor's liability set forth in the immediately preceding sentence will not limit Processor's obligation to settle funds due to Merchant under this Agreement.
D. Processor shall not be deemed to be in default under this Agreement or liable for any delay or loss in the performance, failure to perform, or interruption of any Services to the extent resulting from a Force Majeure Event. Upon such an occurrence, performance by Processor shall be excused until the cause for the delay has been removed and the Processor has had a reasonable time to again provide the Services. No cause of action, regardless of form, shall be brought by either party more than 1 year after the cause of action arose, other than one for the nonpayment of fees and amounts due Processor under this Agreement. Any restriction on Processor's liability under this Agreement shall apply in the same manner to Member Bank. In the event that Merchant has a claim against Member Bank in connection with the Services provided under this Agreement, Merchant shall proceed against Processor (subject to the limitations and restrictions herein), and not against Member Bank, unless otherwise specifically required by the Operating Regulations.

**25. Controlling Documents.** This Agreement (including all addenda and schedules and exhibits hereto and all documents and materials referenced herein) supersedes any and all other agreements, oral or written, between the parties hereto with respect to the subject matter hereof, and sets forth the complete and exclusive agreement between the parties with respect to the Services and, unless specifically provided for herein, other services are not included as part of this Agreement. If there is a conflict between the Bank Card Merchant Agreement and an addendum or schedule or exhibit hereto, the addendum or schedule or exhibit shall control. If there is a conflict between the Rules Summary and this Agreement, the Rules Summary shall control. If there is a conflict between Operating Regulations and this Agreement, the Operating Regulations shall control. If there is a conflict between the Operating Regulations and the Rules Summary, the Operating Regulations shall control.

**26. Regulatory Remedial Right.** Processor may suspend or cease providing any Service in this Agreement if: (i) in Processor's reasonable opinion, such Service, or the business of Merchant, violates or would violate the Operating Regulations, or any federal, state or local statute or ordinance, or any regulation, order or directive of any governmental agency or court; (ii) Merchant is accused by any federal, state or local jurisdiction of a violation of any applicable statute or ordinance or any regulation, order or directive of any governmental agency or court, or if Processor reasonably believes, based upon the opinion of its legal counsel, that Merchant may be in violation of any of the foregoing; and/or (iii) in Processor's reasonable opinion, Merchant's activities may result in increased regulatory scrutiny or reputational harm. Processor may also suspend or cease providing any Service in this Agreement to Merchant if directed to do so by Member Bank. Should Merchant not process sales transactions through Processor's system for a period of one year or more, Processor may remove Merchant from Processor's systems without notice, without relieving Merchant from any of Merchant's obligations under this Agreement.

**27. Conversion; Deconversion.** Merchant shall take all necessary steps to, and shall, promptly convert to Processor's system for the Services in this Agreement not later than 90 days after the execution of this Agreement by Processor. Processor agrees that it shall not charge Merchant for Processor's standard and customary internal testing and conversion preparation only, in connection with Merchant's

SD\1649311.2

initial conversion to Processor's system at the commencement of this Agreement, and as determined by Processor in its sole reasonable discretion. The foregoing shall not be deemed to limit Merchant's obligation to pay any third party fees and expenses incurred by Processor in connection with Merchant's conversion, which shall remain the sole responsibility of Merchant. Merchant agrees to be responsible for all direct and indirect costs (including but not limited to those incurred by Processor, its affiliates and/or agents) in connection with and/or related to Merchant's conversion from Processor at the termination of this Agreement and/or related to any conversion or programming effort affecting the Services after Merchant's initial conversion to Processor.

**28. Confidential Information.**

(a) Confidential Information Supplied by Processor. Merchant acknowledges that Processor will be providing Merchant with certain confidential information, including but not limited to, this Agreement, third party audit reports, and information relating to the finances, systems, methods, techniques, programs, devices and operations of Processor and/or the Associations. Merchant shall not disclose any such confidential information to any person or entity (other than to those employees and Merchant Suppliers of Merchant who participate directly in the performance of this Agreement and need access to such information). Without limiting the foregoing, Merchant agrees that it will fully comply with any and all confidentiality and security requirements of the USA Patriot Act (or similar law, rule or regulation), VISA, MasterCard, Discover, and/or Other Networks.

(b) Confidential Information Supplied by Merchant. Processor acknowledges that Merchant will be providing Processor with certain confidential information, including information relating to the methods, techniques, programs, devices and operations of Merchant. Such confidential information does not include transaction information which has been de-identified or aggregated. Processor will not disclose confidential and proprietary information about Merchant to any person or entity (other than to those employees and agents of Processor who participate directly in the performance of this Agreement and need access to such information). Merchant acknowledges receipt of the Vantiv, LLC privacy notice ("Privacy Notice"). Merchant should direct any questions or requests for another copy of the Privacy Notice to a Processor customer service representative or Merchant's primary relationship manager, if applicable. Notwithstanding anything to the contrary in the Privacy Notice or this Agreement, Processor may use, disclose, share, and retain any information provided by Merchant and/or arising out of the Services, during the term and thereafter,: (a) with Merchant's franchisor, Merchant's franchisee(s), association(s) to which Merchant belongs and/or belonged as of the commencement of this Agreement, (b) with any affiliate of Merchant; (c) in response to subpoenas, warrants, court orders or other legal processes; (d) in response to requests from law enforcement agencies or government entities; (e) to comply with applicable laws, regulations, or Operating Regulations; (f) with Processor's affiliates, partners and agents; (g) to perform analytic services for Merchant, Processor and/or others including but not limited to analyzing, tracking, and comparing transaction and other data to develop and provide insights for such parties as well as for developing, marketing, maintaining and/or improving Processor's products and services; and/or (h) to offer or provide the Services hereunder.

(c) Miscellaneous. The parties acknowledge that the injury that would be sustained by the party disclosing information as a result of the violation of this Section 28 cannot be compensated solely by money damages, and therefore agrees that the disclosing party shall be entitled to seek injunctive relief and any other remedies as may be available at law or in equity in the event of a violation of the provisions contained in this Section 28. The restrictions contained in this Section 28 shall not apply to any information which becomes a matter of public knowledge, other than through a violation of this Agreement or other agreements between the parties.

(d) Publicity. Merchant and Processor agree that they will work together to issue a mutually agreeable joint press release after the execution of this agreement and/or after the conversion of Merchant to Processor's Services. In any event, Merchant acknowledges and agrees that Processor may make public the execution of this Agreement by Merchant and/or any of Merchant's affiliates, and/or the Services that may be or have been provided under the Agreement. Merchant agrees that Processor may include Merchant's name and logo on a list of

Processor's customers, which may be made public. Merchant agrees that, upon Processor's request, Merchant will provide testimonial information related to the Services received by Merchant hereunder.

**29. Financial Statements.** If at any time Merchant is not a publicly traded company, Merchant shall provide Processor with its most recent audited annual financial statement prepared and certified by Merchant's chief financial officer within 15 days of Processor's request therefore.

**30. No Waiver.** If either party waives in writing an unsatisfied condition, representation, warranty, undertaking or agreement (or portion thereof) set forth herein, the waiving party shall thereafter be barred from recovering, and thereafter shall not seek to recover, any damages, claims, losses, liabilities or expenses, including, without limitation, legal and other expenses, from the other party in respect of the matter or matters so waived. Except as otherwise specifically provided for in this Agreement, the failure of any party to promptly enforce its rights herein shall not be construed to be a waiver of such rights unless agreed to in writing. Any rights and remedies specifically provided for in any addendum or schedule or exhibit are in addition to those rights and remedies set forth in this Agreement and/or available to Processor at law or in equity.

**31. Compliance with Law.**

Merchant represents and warrants to Processor that it will comply with all applicable federal, state and local laws and regulations in connection with Merchant's receipt of the Services and/or applicable to Merchant's business operations. Processor will comply with federal, state and local laws and regulations applicable directly to Processor in its provision of the Services.

**32. Security, Data Incidents.** Merchant will be solely responsible for the security, quality, accuracy, and adequacy of all transactions and information supplied hereunder, and will establish and maintain adequate audit controls to monitor the security, quality, maintenance, and delivery of such data. Without limiting the generality of the foregoing, Merchant represents and warrants to Processor that it has implemented and will maintain secure systems for maintaining and processing information and for transmitting information to Processor. Processor shall have no liability whatsoever for the security or availability of any communications connection used in connection with the Services provided hereunder. Merchant acknowledges that Processor is responsible only for the security of its own proprietary systems, and not for the systems of any third party, including without limitation any Merchant Supplier of Merchant. Merchant shall notify Processor immediately if Merchant becomes aware of or suspects a Data Incident. Merchant agrees to fully cooperate with Processor and any Association with respect to any investigation and/or additional requirements related to a suspected Data Incident.

**33. Audits.** At any reasonable time upon reasonable notice to Merchant, Merchant shall allow auditors, including the auditors of any Association or any third party designated by Processor or the applicable Association, to review the files held and the procedures followed by Merchant at any or all of Merchant's offices or places of business. All audits shall be at Processor's sole expense unless such audit is required by the Operating Regulations or an Association, in which case such audit will be at Merchant's sole expense. In the event the audit is initiated by Processor, such audit shall be directly relevant to this Agreement, and shall be limited in scope to those areas related to the provision of Services hereunder. Merchant will assist such auditors as may be reasonably necessary for them to complete their audit. In the event that a third-party audit is requested by an Association, and/or required by the Operating Regulations, Processor may, at its option, either retain a third party to perform the audit, or require that Merchant directly retain a specific third party auditor. If Processor requires that Merchant directly retain the auditor, Merchant shall arrange immediately for such audit to be performed, and will provide Processor and the Associations with a copy of any final audit report.

**34. System Requirements and Upgrades.** Merchant agrees that the Services shall be provided in accordance with Processor's then current systems, standards and procedures and that Processor shall not be required to perform any special programming, to provide any special hardware or software or to implement any other system, program or procedure for Merchant. Unless otherwise agreed in writing by Processor, all sales transaction, settlement and other data and

SD\1649311.2

information used in connection with the Services shall be provided to Processor in Processor's then current data formats and by means of Processor's then current telecommunications configurations and protocols. Processor may make changes in the Services based upon, but not limited to, technological developments, legislative or regulatory changes, or the introduction of new services by Processor. Merchant shall comply with all time deadlines, equipment and software maintenance and upgrading requirements to the extent required by the Associations and/or Operating Regulations. Merchant shall use best efforts to comply with all other time deadlines, equipment and software maintenance and upgrading requirements which Processor may reasonably impose on Merchant from time to time.

**35.  Title to the Services.**  Merchant agrees it is acquiring only a nontransferable, non-exclusive right to use the Services.  Processor shall at all times retain exclusive title to the Services, including without limitation, any materials delivered to Merchant hereunder and any invention, development, project, trade name, trademark, service mark, software program, or derivative thereof, developed in connection with providing the Services or during the term of this Agreement.

**36.  Limited Acceptance.**  If so indicated below, Merchant acknowledges and agrees that it wishes to be a Limited Acceptance merchant, which means that Merchant has elected to accept only certain VISA/MasterCard card types as indicated below, or via later notification. Merchant further acknowledges and agrees that Processor has no obligation other than those expressly provided under the Operating Regulations and applicable law as they may relate to limited acceptance and that Processor's obligations do not include policing card types at the point of sale.  As a Limited Acceptance Merchant, Merchant will be solely responsible for the implementation of its decision for Limited Acceptance. Merchant will be solely responsible for policing, at the point of sale, the card type(s) of transactions it submits for processing by Processor. Should Merchant submit a transaction for processing for a card type it has indicated it does not wish to accept, Processor may process that transaction and Merchant will pay the applicable fees, charges, and assessments associated with that transaction. For Merchant's convenience, a general description of VISA/MasterCard card types are:

a.  Consumer Credit - a consumer credit card issued by a U.S. Issuer or a commercial credit card issued by a non-U.S. Issuer; this category does not include VISA or MasterCard branded signature-based debit cards.

b.  Consumer Debit - a VISA or MasterCard branded signature-based debit card (including certain stored-value and prepaid cards).

c.  Commercial - a VISA or MasterCard branded credit card issued by a U.S. Issuer that bears the descriptive term "Business Card", "Corporate Card", "Purchasing Card", "Fleet Card", or similar descriptive term  indicated pursuant to the Operating Regulations.

Only if checked below, Merchant wishes to be a Limited Acceptance Merchant, which means that Merchant will accept only the VISA/MASTERCARD card types indicated below:

☐ VISA Credit Cards
☐ VISA Debit Cards (signature based)
☐ MasterCard Credit
☐ MasterCard Debit Cards (signature based)

**37.  Security Interest.**  This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to Processor a security interest in all accounts owned or controlled by Vantiv at Member Bank that are funded with settlement amounts, including the Reserve Account, and the proceeds thereof (collectively, the "Secured Assets", to secure all of Merchant's obligations under this Agreement. With respect to such security interest, Processor will have all rights afforded under the Uniform Commercial Code, any other applicable law, and in equity. In addition to the security interest in the Secured Assets, Processor shall have a contractual right of setoff against the Secured Assets.

Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action by Processor or notation in the Processor's records, although Processor may enter such set off on its books and records at a later time.  Merchant warrants and represents that no other person or entity has a security interest in the Secured Assets. If a bankruptcy

proceeding is filed by or against Merchant under the Bankruptcy Code (whether the petition is filed voluntarily and/or involuntarily), it waives any applicable protection related to the automatic stay provisions of 11 U.S.C. §362 (or any replacement section) and consents to an appropriate reserve of funds being established between the parties pursuant to this Agreement or by Court Order.

**38.  Modification of Agreement.**  Except as provided in this Agreement, this Agreement including any addendum or schedule or exhibit hereto shall only be modified or amended by an instrument in writing signed by Merchant and Processor. Any changes, additions, stipulations or deletions, including lining out, by Merchant, except where indicated by a space to be filled in (e.g., the space for Merchant's name and address), shall not be deemed to be agreed to or binding upon Processor unless agreed to in writing in the form of an amendment signed by each party hereto. Merchant agrees that Processor may amend this Agreement upon notice to Merchant if such amendment is a requirement of applicable law or an Association.

**39.  Headings and Construction.**  The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision.  Merchant and Processor each acknowledge that the limitations and exclusions contained in this Agreement have been the subject of active and complete negotiation between the parties and represent the parties' voluntary agreement. The parties agree that the terms and conditions of this Agreement shall not be construed in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation of this document.

**41.  Authorization.**  Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, operating agreement, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

**42.  Counterparts.** This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**43.  Facsimile and Electronic Signatures.**  Merchant and Processor agree that electronic signatures will have the same legal effect as original (i.e. ink) signatures and that an electronic, scanned, facsimile, or duplicate copy of any signatures will be deemed an original may be used as evidence of execution.

**44.  Member Bank.**  The Processor and Member Bank may jointly or individually assert or exercise any rights or remedies provided to Processor and Member Bank hereunder.  Processor and Member Bank reserve the right to allocate the duties and obligations assigned hereunder to Processor between themselves, as they deem appropriate in their sole discretion.  Member Bank has certain obligations to Merchant pursuant to the Operating Regulations.  In the event of any conflict between this Agreement and the Operating Regulations on the subject of Member Bank's obligations, the Operating Regulations shall control. Processor is party to an agreement with Member Bank and under such agreement is authorized to provide the services described herein. This Agreement shall be deemed accepted by Member Bank as of the date the first transaction is acquired under this Agreement. As of the commencement of this Agreement, Member Bank shall be Fifth Third Bank, an Ohio banking corporation, located in Cincinnati, OH.  The Member Bank may delegate certain or all of its duties to an affiliate of the Member Bank at any time, without notice to Merchant.  The Member Bank may be changed, and its rights and obligations assigned to another party by Processor at any time without notice to Merchant.

SD\1649311.2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized officers as of the dates set forth below.

**VANTIV, LLC**

By: _Brian Kessans_ — DocuSigned by:

Name: Brian Kessans ─7D5A813E3983433...

Title: Director Contracts mgmt

Date: 11/9/2015 | 11:32 ET

**MERCHANT LEGAL NAME: PIRCH, INC**

By: _[signature]_

Name: DAVID G. ROBSON

Title: CFO

Date: NOVEMBER 6, 2015

S:\drnps\legal\MPS Legal\Merchant - Vantiv M - R\Pirch\Pirch - VNTV - BCMA - SS Terms and Conditions (9 2015) Vantiv clean 11-6-15.docx



9.2015-MM

PIRCH, INC.

**MERCHANT PRICE SCHEDULE TO
THE BANK CARD MERCHANT AGREEMENT**

This Merchant Price Schedule shall be a schedule ("Schedule") to the Bank Card Merchant Agreement between Processor, Member Bank and Merchant. As used herein, the term "Agreement" shall have the meaning ascribed to it in the Bank Card Merchant Agreement. Except for the terms defined herein, the capitalized terms herein shall have the same meaning as ascribed to them in the Agreement. In the event of a conflict between the Agreement and this Schedule, this Schedule shall control.

**I. PROCESSOR TRANSACTION AND OTHER FEES:**

The fees applicable to Merchant shall be assessed by Processor to Merchant on a daily, monthly and/or other periodic basis at the sole reasonable discretion of Processor and which Processor may change from time to time upon notice to Merchant in accordance with Processor's Service Delivery Process. As of the execution of this Agreement, Merchant will receive one invoice from Processor and be treated as one entity for all of Merchant's locations combined, except for interchange and certain related fees, interchange adjustments and certain other third party fees which Processor will assess to Merchant on a location by location basis. However, Merchant acknowledges and agrees that Processor, at its sole option and which Processor may change from time to time upon notice to Merchant in accordance with Processor's Service Delivery Process, may assess some or all of the fees in the Agreement to Merchant on a consolidated basis (i.e., all Merchant locations shall be combined and treated as a single entity) and/or some or all of the fees in the Agreement to Merchant on a location by location basis.

**A. Transaction Fees:**

Transactions shall include but not be limited to sales drafts, authorizations, credits, account verifications, other point of sale transactions, etc. A sales draft submitted with an authorization is one transaction.

(i) VISA/MasterCard/Discover Transactions

☐ VISA/MasterCard/Discover (including NOVUS Network)/PayPal Transactions $_____ per transaction

**All-In Basis Point pricing**
☒ VISA/MasterCard/Discover (including NOVUS Network)/PayPal Transactions ▒▒▒▒▒% of the gross sales amount of each transaction*

**All-In Transaction pricing**
☐ VISA/MasterCard/Discover (including NOVUS Network)/PayPal Transactions $_____ per transaction*

* includes MC Settlement Fee, MC Network Access and Brand Usage Fee, Visa Base II Fee and Visa Acquirer Processing Fee as set forth in Exhibit A. Communication fee is Included in the All-In Transaction pricing or All-In Basis Point Transaction pricing so long as Merchant uses Processor's standard dial or SSL processing methodology; otherwise, Processor's standard fees and charges shall apply.

(Transactions processed on any Diner's Club card presenting the MasterCard logo will be processed and billed as a MasterCard transaction. In the event that Merchant's average ticket amount is greater than that provided by Merchant to Processor, or reasonably anticipated by Processor at the commencement of this Agreement, or in a event that Merchant's processing method differs materially from that reasonably anticipated by Processor at the commencement of this Agreement, Processor reserves the right to increase the per transaction fee assessed to Merchant pursuant to this Section. VISA and MasterCard Services shall each be additionally subject to a $15.00 per month minimum per MID. Processor and Merchant acknowledge and agree the Visa Fixed Acquirer Network Fee ("FANF") and the MasterCard Acquirer Fee will be billed as direct pass thru to the Merchant.

(ii) American Express/Diners Club/
Carte Blanche Transactions $▒▒▒▒ per transaction

(iii) PIN Debit Transactions $▒▒▒▒ per transaction

(iv) All Other Transactions Quoted

**B. Other Fees:**

(i) Chargeback/Adjustment
Processing ▒▒▒▒per chargeback/adjustment *

*Does not include any fees related to chargebacks/ adjustments which may be imposed by third parties such as the Associations. This Fee applies to prearbitration transactions, compliance cases, and any other transaction that is similar in nature to a chargeback/adjustment.

(ii) Direct, powered by Vantiv
Access Fee ▒▒▒▒/month/User ID used *

* Each User ID that is used in a given month, as determined by Processor's records of User IDs which have logged onto Direct, powered by Vantiv during the month, will result in a separate access fee charge. Processor's Direct, powered by Vantiv service is subject to change upon notice in accordance with Processor's Service Delivery Process and will be provided in accordance with, and subject to the terms of, the Agreement and Processor's Service Delivery Process.

(iii) iQ
Access Fee No Charge *
* Provides access to reports, merchant summary, transaction research and basic alerts

(iv) Processor Voice Transaction Surcharge ▒▒▒▒/transaction *

*includes operator assisted voice authorizations, Processor's automated digital voice response system ("DVRS"), and other authorization systems used by Merchant and supported by Processor in accordance with its Service Delivery Process. Excludes gift card voice transactions.

(v) Annual Fee Waived

(vi) Wire Transfer Quoted

(vii) Monthly Service Fee Waived

(viii) Compliance and Regulatory Fee ▒▒▒▒/MID/Year
(capped at ▒▒▒▒/chain)

(ix) (Unbundled Signature Debit) Routing Fee Waived

(x) Tiered Enhanced Surcharge Fee
See Tiered Enhanced Surcharge schedules for applied rates

Rate (**Select One**): If no box checked, default is All Rates.
☐ All Rates (Base/Downgrade) Apply
☐ Downgrade Rate Only Apply
☒ No Rates Apply

Voucher Code (**Select One**): If no box checked, default is Voucher Code 99.
☐ 00 ☐ 01 ☐ 02 ☐ 04 ☐ 05 ☐ 06 ☐ 07 ☐ 10 ☐ 11 ☐ 12
☐ 13 ☐ 14 ☐ 15 ☐ 17 ☐ 18 ☐ 19 ☐ 25 ☐ 27

For certain non-qualifying transactions, Processor assesses a surcharge of a certain percent of the transaction amount ("Non-Qualified Surcharge Fee" and/or "Routing Fee") as set forth in the Agreement on all sales transactions that do not qualify at Merchant's base rate (e.g., an international, commercial, or rewards transaction, etc.) (such transactions are referred to herein as "Non-Qualified Transactions"). Processor reserves the

right and may amend the Non-Qualified Surcharge Fee amount from time to time upon notice to Merchant.

(xi) PCI Non-Validation Fee $MID/month
(Capped at $█████chain/month)

If Processor reasonably believes Merchant is not fully compliant with the Processor Rules, Operating Regulations (including but not limited to the Payment Card Industry Data Security Standard, the VISA Cardholder Information Security Program, the MasterCard Site Data Protection Program, and any other program or requirement that may be published and/or mandated by the Associations), or any Laws, or in the event Merchant fails to prove such compliance upon request from Processor, Processor reserves the right to charge Merchant a reasonable fee until Merchant proves compliance with the Bank Rules, Operating Regulations, and Laws, and Merchant shall pay such amount to Processor. This fee will be in addition to any other amounts due under the Agreement, including but not limited to all fines, fees, penalties, loss allocations, assessments, registration expenses, certification expenses, and other amounts assessed by third parties.

(xii) EMV Non-Enabled Fee

Low Risk ████% of the gross sales per month
Moderate Risk ██% of the gross sales per month
High Risk ██% of the gross sales per month

The EMV Non-Enabled Fee is effective beginning October 2015 if Merchant does not have EMV enabled equipment and/or software. The EMV Non-Enabled Fee is determined based on the chargeback liability risk of your MCC as determined by us. Transactions will be evaluated monthly at the MID level and assessed at the chain level when applicable. This fee is based on the gross sales amount of each card present transaction.

(xiii) Breach Assist

In the event Merchant is enrolled in the Breach Assist Program ('BAP') offered by Processor, the indemnification required by Merchant under this Agreement will only be reduced by amounts actually recovered by Processor in connection with the BAP and only to the extent that such amounts are specifically related to a data breach involving solely Merchant. The BAP is not applicable to Level 1 merchants. The limited indemnity waiver provided by the BAP may not cover all the costs associated with a data breach and the specific terms and conditions of the BAP are available for Merchant to review at www.RoyalGroupServices.com/FifthThird or by contacting a customer service representative at 1-800-393-1345.

1 - 10 MIDs / MID/ Month
11 - 20 MIDs █████/ MID/ Month
21+ MIDs █████/ Chain/ Month

_____ Initial herein to opt-out of the Breach Assist Program. As such, I understand I will not be eligible to receive a waiver of any portion of my indemnity obligations to Processor under the Agreement in the case of a suspected or actual data breach at any of my merchant location(s), including waiver of any obligation to pay expenses, fines, assessments, or penalties in the event of such suspected or actual breach of my merchant location(s). By opting-out, Merchant will be assessed a PCI Compliance Support fee of $50 per location per year capped at $150 per Chain per year

**C. Payment Application Data**

Notwithstanding merchant's disclosure of the information requested herein, Processor cannot and does not undertake any responsibility to advise, direct or otherwise validate merchant's payment application as compliant with the Payment Application

Data Security Standard (PA DSS), the PCI DSS and/or Visa's Payment Application Best Practices (PABP). Merchant hereby ensures that it has reviewed and confirmed that such application(s) comply with the PABP, PA DSS and the PCI DSS.

(i) Have you suffered a system intrusion or "hack" that resulted in the compromise of account data?  ☐ Yes   ☐ No

(ii) ☑ Payment Gateway (e.g. Authorize.net, etc.)
Name of Service Provider/Gateway    AUTHORIZE.NET

(iii) ☐ Other (please list): _____

(iv) Merchant Compliance Contact Information
Name _____
Phone Number _____
Email Address (if preferred form of communication)
_____

(v) Integrated Software Solution (e.g. Micros, Aloha etc.)

If not using a payment application (i.e. software) to process transactions, please mark "N/A" in the Payment Application Vendor and Payment Application Name section. Please provide all possible information regarding terminals and Integrated Software Solutions. Provide a separate document, if necessary.

| | Payment Application Vendor | Payment Application Name |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |

| | Version No. | Last Upgrade | Type of Connection (e.g. Dial-up, Internet, etc.) |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |

| | Quantity | Pmt Code | Unit Code |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |

**D. Equipment**

Pricing for Equipment is for first equipment order only. Thereafter, any Equipment ordered by Merchant will be charged at Processor's standard rates unless otherwise indicated via an amendment.

(i) Environment _____

(ii) Front-end(s) _____

(iii) Terminals, Printers

| | Model | Connection Type |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

| | Quantity | Pmt Code | Unit Price |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

**E. Regional and National POS Networks**

Merchant agrees to pay Processor a network access fee of ████ per month per Other Network for the following networks. The Processor

network access fee is in addition to all other applicable fees in this Schedule and in addition to the fees assessed by the applicable networks.

| | |
|---|---|
| Accel/Exchange Network | Armed Forces Financial ("AFFN") |
| Alaska Option Network | Credit Union 24 |
| Fleet One | Interlink |
| Jeanie | Maestro |
| Member Access | NetWorks ("NETS") |
| NYCE | Pulse |
| Shazam | STAR |
| Voyager | Wright Express |
| Electronic Benefits Program ("EBT") | Other Networks |

## II. TELECOMMUNICATION FEES

Merchant agrees to pay Processor all then current telecommunications fees and assessments as imposed by telecommunications services providers, Processor, Member Bank, VISA, MasterCard, Discover, and/or Other Networks in connection with the Services Merchant receives hereunder whether incurred by Merchant, Processor, Member Bank, their affiliates and/or agents. The following telecommunications fees shall be paid by Merchant but are subject to change upon notice to Merchant in accordance with Processor's Service Delivery Process, based on increases and/or surcharges by telecommunications service providers, Processor, Member Bank, VISA, MasterCard, Discover, and/or Other Networks and such changes shall be automatically effective and immediately payable when assessed by Processor. Unless otherwise indicated herein or in the Agreement, the following telecommunications fees are in addition to transaction fees, and interchange and other third party reimbursements.

**A.  Merchant Host to Processor Host Direct Connect Port Fees:**

(i)    Monthly Port Fees                                                     Quoted

(ii)   Device Fee                          REDACTED terminal / month *
*Merchant POS Terminals Directly Connected to Processor Host

(iii)  Diner's Club/American Express/
       Carte Blanche/ Check Guarantee
       Transactions Surcharge Fee                                          Waived

(iv)  Discover Transactions Surcharge Fee                                  Waived

(v)   Other                                                                 Quoted

## III.  NETWORK FEES

Merchant agrees to pay Processor all then current fees, fines, assessments, loss allocations, and penalties as imposed by the Associations, including interchange fees, whether incurred by Merchant, Processor, Member Bank, its affiliates and/or agents. Processor may allocate any such amounts in a manner as it deems advisable in its sole reasonable discretion.  The interchange and other fees as set forth in this Agreement, on the respective Network website , or, with respect to interchange, as otherwise made available to Merchant, are, or were, in effect but are subject to change and to surcharges by the applicable Association with such changes and/or surcharges effective as determined by such organizations. Each sales transaction is evaluated separately by the applicable Association to determine the qualifying interchange and other fees.  If for any reason any sales transaction submitted on behalf of the Merchant fails to qualify for the lowest interchange or other fees, Processor at its option may charge Merchant for any incremental fees or expenses.  Sales transactions occurring at Merchant's locations outside the United States (when supported by Processor at its sole discretion) are subject to additional charges which shall be assessed to Merchant which shall be assessed to Merchant as imposed by the applicable Association.

## IV.  OPTIONAL SERVICES

☐  Skipjack Basic Services
    Set Up Fee                                                  $_____/MID
    Monthly Support Fee                                         $_____/Month/MID
    Transaction Fee                                             $_____/transaction

Transactions include, but are not limited to, authorizations, settlement transactions and credits.

☐  Skipjack Platinum Services
    Set Up Fee                                                  $_____/MID
    Monthly Support Fee                                         $_____/Month/MID
    Transaction Fee                                             $_____/transaction
    Transactions include, but are not limited to, authorizations, settlement transactions and credits

☐  3Delta EC-Batch Services (Includes EC-Zone at no additional cost)
    Set Up Fee                                                  $_____/MID
    Authorization Fee                                           $_____/Authorization
    Monthly Support Fee (Includes up to 5 user Ids)
    Plan A:
       0 – 12,000 transactions/year/MID                         $_____/Month/MID
                                                         plus $_____/transaction
       12,001+ transactions/year/MID          As Quoted by 3Delta
       A "transaction" is defined for billing purposes as an
       authorization attempt, forced transaction or a credit/return.

    EC-Batch Integration Fee* (one time only)                   $_____/MID
    EC-Batch Integration Support includes one hour of consultation
    with a 3Delta Systems integration specialist and a test account on
    3Delta Systems test environment. Additional charges may accrue
    if a Merchant desires consultative and integration services. These
    fees will be quoted based on discussions between 3Delta and
    merchant.

☐  3Delta EC-Linx Services (Includes EC-Zone at no additional cost)
    Set Up Fee                                                  $_____/MID
    Authorization Fee                                           $_____/Authorization
    Monthly Support Fee (Includes up to 5 user Ids)
       Plan A:
       0– 12,000 transactions/year/MID                          $_____/Month/MID
                                                           Plus $_____/transaction
       12,001+ transactions/year/MID          As Quoted By 3Delta
       A "transaction" is defined for billing purposes as an
       authorization attempt, forced transaction or a credit/return.

    EC-Linx Integration Fee* (one time only)                    $_____/MID
    EC-Linx Integration Support includes one hour of consultation
    with a 3Delta Systems integration specialist and a test account on
    3Delta Systems test environment. Additional charges may accrue
    if a Merchant desires consultative and integration services. These
    fees will be quoted based on discussions between 3Delta and
    Merchant.

☐  3Delta EC-Zone Services
    Set Up Fee                                                  $_____/MID
    Authorization Fee                                           $_____/Authorization
    Monthly Support Fee (Includes up to 5 user Ids)
    Plan A:
       0 – 12,000 transactions/year/MID                         $_____/Month/MID
                                                         plus $_____/transaction
       12,001+ transactions/year/MID          As Quoted by 3Delta
       A "transaction" is defined for billing purposes as an
       authorization attempt, forced transaction or a credit/return.

☐  Other 3Delta Fees (regardless of product used)
    EC-Zone Item Master Database Load                           $_____/Use
    Additional Pkg of 5 User IDs                                $_____/Month/MID
    Individualized Training                                     $_____/Hour
    Individualized Training is training by a 3DSI employee for a
    specific merchant beyond the free online training services.

☐  Slim CD Services
    Setup Fee                                                   $_____/Site ID
    Slim CD Enterprise Monthly Support Fee                      $_____/Site ID
    Slim CD Pro Monthly Support Fee                             $_____/Site ID
    Slim CD Transaction Fee As Quoted or Processor's Standard Fee
    WEB Developers Kit                                          $_____/Kit
    POS Developers Kit                                          $_____/Kit
    Secure Hosted Page Setup Fee                                $_____

☐  Cardinal Commerce

Merchant Price Schedule to the Bank Card Merchant Agreement
Page 3 of 4

eCommerce Plus Setup Fee $_____
eCommerce Plus Monthly Fee $_____/month
eCommerce Plus Per Credit Transaction Fee $_____/transaction
eCommerce Plus Per Alternative Payment Fee $_____/transaction

☐ Trust Commerce
Standard Set-Up Fee $_____/MID
Standard Monthly Fee $_____/Month/MID
Standard Transaction Fee $_____/transaction
Enterprise Set-Up Fee $_____/Chain
Enterprise Monthly Fee $_____/Month/Chain
Enterprise Transaction Fee $_____/transaction
Annual User ID Support Fee $_____/User ID
Annual Payment Portal Maintenance Fee $_____/MID
CreditGuard Transaction Fee $_____/transaction

☐ Payflow Link
Link Transaction Fee $_____/transaction
Link Recurring Billing Monthly Fee $_____/Month/MID

☐ Payflow Pro
Pro Set-up Fee $_____/MID
Pro Monthly Service Fee $_____/Month/MID
Pro Transaction Fee $_____/transaction
Pro Recurring Billing Monthly Fee $_____/Month/MID

☐ Payflow Advanced Fraud Protection
Protection Monthly Fee $_____/Month/MID
Transaction Fee $_____/transaction

☐ Payflow Buyer Authentication
Monthly Fee $_____/Month/MID
Transaction Fee $_____/transaction

Other Services (any other service not listed herein)        As Quoted

**V.   OTHER SERVICES**        Per the Agreement or Quoted

In the event Merchant rents or purchases any equipment from Processor in connection with the Services, Merchant agrees to abide by all the terms and conditions of Processor's standard Addendum B which is incorporated herein. Merchant acknowledges that Processor rounds interchange and other fees and amounts in accordance with its Service Delivery Process. The parties acknowledge that the Bank Card Merchant Agreement between them, as supplemented by this and other schedules, Addenda and/or Exhibits, set forth the complete and exclusive agreement between the parties with respect to the Services provided.

**VANTIV, LLC**

By:_____ *Brian Kessans* ─DocuSigned by:

Name:_____ Brian Kessans     ─7D5A813E3983433...

Title:_____ Director Contracts mgmt

Date:_____ 11/9/2015 | 11:32 ET

**MERCHANT LEGAL NAME:**      PIRCH, INC.

By:_____

Name:_____ DAVID G. ROBSON

Title:_____ CFO

Date:_____ NOVEMBER 6, 2015

S:\dmps\legal\DAY\Master Merchant Template Library\Fifth Third\VNTV - BCMA - SS Price Schedule Middle Market - Unbundled (9.2015).docx

Chain:_____

**SPECIAL AMENDMENT TO THE AGREEMENT**
**OMNISHIELD ASSURE**

This Special Amendment to the Agreement is made among Processor and _____ PIRCH, INC. ("Merchant"). "Agreement" shall mean the Bank Card Merchant Agreement or Merchant Processing Agreement or other contract document for the Services provided by Processor to Merchant as previously executed by Merchant and any corresponding Schedules, Addenda, Exhibits and Amendments thereto. All other terms and conditions of the Agreement shall remain in full force and effect unless explicitly stated herein. All defined terms shall have the meanings set forth in the Agreement unless otherwise specified herein. The Agreement shall be amended in the following respects.

**A.   The Agreement shall be amended as follows:**

1.   Merchant agrees to participate in one of the OmniShield Assure security bundles noted below. The OmniShield Assure security bundles include security services that are intended to address some of the risks associated with accepting, transporting and storing cardholder data within and throughout the Merchant's environment in accordance with Processor's standards, which Processor may change from time to time in its sole discretion. Processor may utilize and/or license technology from third parties as part of providing security services. Merchant agrees that it shall not acquire any interest in (ownership, intellectual property or otherwise) any of the third party provider software used by Processor to provide the security services. Merchant shall not, and shall have no right to, own, copy, distribute, sub-lease, sub-license, assign or otherwise transfer any portion of such third party provider software used to provide the security services or any materials provided by Processor or to modify, decompile, or reverse engineer any such software, materials, or the Services. The provision and use of any of the security services shall not limit either party's duties and obligations contained in the Agreement. The benefit of using the security services depends on the Merchant's environment, the combination of services chosen by the Merchant, and how the services are implemented within the Merchant's environment. Merchant bears all risk and responsibility for conducting Merchant's own due diligence regarding the fitness of security services for a particular purpose and ensuring that the solution is implemented in alignment with security standards, applicable law, and Processor's best practices and guidelines. Merchant acknowledges that access to certain security services may require the use of or upgrading of certain terminals and/or equipment or changes to transaction processing message specifications at Merchant's sole expense. Not all equipment supports security services. Processor does not warrant or guaranty that use of the security services, in itself, will: (i) result in Merchant's compliance with Operating Regulations and/or applicable law; (ii) prevent any unauthorized breaches of Merchant's terminals, systems or facilities; or (iii) be uninterrupted or error-free.

Merchants with equipment and / or software that are enabled for EMV and card data encryption must participate in one of the following security services bundles:

☐   **OmniShield Assure**                                  $▮REDACTED▮/MID/month (capped at 20 MIDs or $▮REDACTED▮/month)

OmniShield Assure bundle includes Processor's Breach Assist, PCI Assist, Card Data Encryption, Tokenization, and EMV Support services. For Merchants participating in OmniShield Assure, the PCI Non-Validation Fee will be waived.   For Merchants participating in a Vantiv Select Package as noted on the Price Schedule, the OmniShield Assure Fee will be waived.

☐   **OmniShield Assure Basic**                          $▮REDACTED▮MID/month (capped at 20 MIDs or $▮REDACTED▮/month)

OmniShield Assure Basic bundle includes Processor's PCI Assist, Card Data Encryption, and EMV Support services. In addition to the OmniShield Assure Basic monthly fee, Merchant may also be assessed the PCI Non-Validation Fee.

Merchants with equipment and / or software that are not enabled for EMV and card data encryption must participate in the following bundle:

☑   **Breach Assist Plus**                                    $▮REDACTED▮MID/month (capped at 20 MIDs or $▮REDACTED▮/month)

Breach Assist Plus bundle includes Processor's Breach Assist, PCI Assist, and Tokenization services.    In addition to the Breach Assist Plus monthly fee, Merchant may also be assessed the PCI Non-Validation Fee and the EMV Non-Enabled Fee.

Regardless of choices identified herein, the Merchant's invoice will automatically reflect the security services bundle that best aligns with the Merchant's actual environment. For example, selecting OmniShield Assure Basic, but failing to implement EMV and card data encryption enabled equipment would result in the Merchant receiving and being invoiced for the Breach Assist Plus security services bundle.

Additionally, if the Merchant modifies their hardware post contract execution, the Merchant will automatically receive the security services bundle that reflects the Merchant's then-current environment. For example, if the Merchant starts with the Breach Assist Plus security services bundle and later updates its equipment to include EMV and card data encryption, it would automatically be re-aligned with the OmniShield Assure security services bundle.

2.   Definitions.

a.   <u>Breach Assist</u> – In the event Merchant is enrolled in the Breach Assist Program ("BAP") offered by Processor through the Breach Assist Plus or OmniShield Assure bundles provided herein, the indemnification required by Merchant under this Agreement will only be reduced by amounts up to the limits set by the service provider that are actually recovered by Processor in connection with the BAP and only to the extent that such amounts are specifically related to a data breach involving solely Merchant. The limited indemnity waiver provided by the BAP will not cover all the costs associated with a data breach. The specific terms and conditions of the BAP are available for Merchant to review at www.RoyalGroupServices.com/FifthThird or by contacting a customer service representative at 1-800-393-1345.

b.   <u>PCI Assist</u> – PCI Assist is a set of streamlined online tools to help merchants achieve, maintain and track PCI compliance. PCI Assist helps clients review PCI DSS compliance requirements and complete their Self Assessment Questionnaire (SAQ) and, as recommended, conduct periodic vulnerability scans of their network.

9.2015v2-VNTV

c.  Card Data Encryption – The Card Data Encryption Service is a two part service designed to: (i) encrypt (make unreadable) card data information at the origin of the payment transaction, which is a PCI-PTS certified Secure Cryptographic Device (SCD) that has licensed Card Data Encryption functionality that aligns with the Card Data Encryption technologies hosted by the Processor; and, (ii) decrypt card data information at the destination of the transaction, which are the Processor's data systems. Merchant acknowledges and agrees that SCD Card Data Encryption functionality is required and may require Merchant to engage an appropriate third party provider or authorized reseller and that said licensed functionality may incur fees in addition to those set forth herein. Card data information protected by the Card Data Encryption Service may include Track 1 or Track 2 data (Magnetic Stripe Data obtained through a magnetic card swipe read) or PAN Data (Manually Entered Personal Account Number ("card") data) as appropriate to the type of transaction processed on the SCD. The SCD functionality supporting the Card Data Encryption Service is designed to securely store or generate encryption keys which are used in conjunction with the Card Data Encryption functionality to encrypt card data at the moment that the card data is captured by the SCD. The Card Data Encryption Service applies only to transactions that were encrypted by the SCD and sent from the terminal to Processor's authorization and settlement systems pursuant to the Agreement. Supported transactions include, but may not be limited to, those associated with credit (signature), debit (signature) and debit (PIN). Merchant acknowledges that provision of Card Data Encryption services to Merchant is subject to the availability of the licensed encryption software from the applicable third party provider and Merchant's compliance with the terms of this amendment and the Agreement.

d.  Tokenization - Tokenization is a service in which cardholder PAN data, once received by the Processor, is replaced with a surrogate ("Token") value. Deliverables of the Tokenization service include; (1) the creation of tokens and (2) the recognition and use of a Processor issued pre-existing token to support all post authorization transactions with the Processor, which includes initiating a new authorization with a token value. Data necessary to convert tokens back to Cardholder data will be maintained in Processor's systems. Merchant access to the Tokenization service requires integrating systems to certify token services using Processor's appropriate message specification. Message specifications are limited to those that exist in Processor's current Service offering. The Parties agree that the scope of the Tokenization service does not include the certification or systematic configuration of third parties or firmware licensing as selected by the Merchant to support Tokenization services. For the purposes of this Amendment, Merchant will be provided access to Standard Tokenization services with the OmniShield Assure and Breach Assist Plus bundles. Non-Standard, GUI and Batch Tokenization are separate and unique service offerings and respective fees will be quoted to merchant for the use of each service.

- "Standard Tokenization" is provided on a per transaction basis in-line with each authorization request
- "Non-Standard Tokenization" is provided as separate "non-authorization" message to the Processor that results in a token being generated and returned outside of a purchase transaction
- "Graphical User Interface (GUI) Tokenization" is provided for merchant operations personnel with appropriate credentials to convert or revert card values and tokens via Processor provided product interface(s).
- "Batch Tokenization" is provided as a file based service to support the mass conversion of any existing store of cardholder data, and shall mean the process of receiving a file that includes multiple card values, performing the tokenization process for each card value and returning a response file that includes the corresponding token value.

At the conclusion of the contracted term for Tokenization services, whether through the OmniShield Assure bundle, Breach Assist Plus bundle or otherwise, Merchant will have 90 days to request, via written request to Processor, a Batch De-Tokenization of the merchant's token store, located within the Merchant's systems. For purposes of this Amendment, Batch De-Tokenization shall mean the process of receiving a file that includes multiple token values, performing the de-tokenization process for each token value and returning a response file that includes the corresponding card value. After 90 days, Processor will no longer be responsible for maintaining the data necessary to De-Tokenize Merchant's token store or be able to guarantee availability of data. Upon mutual agreement, Processor may offer the Merchant De-Tokenization Data Management Services under separate agreement to support the token store after the termination of the current Agreement supporting Tokenization services.

e.  EMV Support – EMV stands for Europay, MasterCard, and Visa and is a set of global standards for credit, debit and contactless card payments. EMV chip cards help prevent in-store fraud and are nearly impossible to counterfeit. Starting October 1, 2015 merchants who have not made the investment in chip-enabled technology may be held liable for card-present fraud. EMV acceptance requires an EMV enabled standalone terminal or POS system. Vantiv is enabled to process in-store EMV transactions to help reduce fraud liability.

Except as otherwise provided in this Amendment, the terms of the Agreement are hereby ratified and affirmed and shall remain in full force and effect. This Amendment shall have no force or effect unless and until countersigned by Processor.

| FOR VANTIV, LLC | PIRCH, INC. |
| --- | --- |
| | MERCHANT LEGAL NAME |
| By: _Brian Kessans_ | By: _David Rhl_ |
| Name: Brian Kessans —7D5A813E3983433... | Name: DAVID G. ROBSON |
| Title: Director Contracts mgmt | Title: CFO |
| Date: 11/9/2015 \| 11:55 ET | Date: NOVEMBER 6, 2015 |

# EXHIBIT B

O0415

**AMENDMENT NO. 1 TO THE**
**BANK CARD MERCHANT AGREEMENT**

This Amendment No. 1 (the "Amendment") to the Bank Card Merchant Agreement ("Agreement") is made among WORLDPAY, LLC ("Processor"), Member Bank and **PIRCH, INC.** ("Merchant"). The Agreement shall be amended in the following respects and the terms of the Agreement shall govern this Amendment. Any capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement shall be amended in the following respects and shall become effective upon the first day of the calendar month following execution by the parties hereto ("Effective Date").

I. Processor and Merchant acknowledge and agree that the Agreement shall automatically renew for a period of three (3) years from the Effective Date ("Renewal Term"), and thereafter the Agreement shall automatically renew for periods equal to 1 (one) year each.

I. Processor agrees to freeze the Processor per transaction fees in Section I.A of the Merchant Price Schedule to the Agreement currently being assessed to Merchant for the Renewal Term. The foregoing shall not be precluded to include any third party assessments and/or fees.

Except as otherwise provided in this Amendment, the terms of the Agreement are hereby ratified and affirmed and shall remain in full force and effect. This Amendment shall have no force or effect unless and until countersigned by Processor.

| **PIRCH, INC.** | | **WORLDPAY, LLC** | |
|---|---|---|---|
| *Mekall Kaltenbach* | | | *Alison A. Vieth* |
| DF12BCA523D43E... | | | 12C309CAED844C9... |
| Signature | | Signature | |
| Mekall Kaltenbach | | | Alison A. Vieth |
| Printed Name | | Printed Name | |
| CFO | | | Corporate Counsel |
| Title | | Title | |
| 7/27/2023 | | | 10-Aug-2023 \| 12:29 PM PDT |
| Date | | Date | |

S:\dmps\legal\MPS Legal\Merchant - Vantiv M - R\Pirch\Pirch Inc. Amendment No. 1 to BCMA 7-27-2023 ver3.doc

# EXHIBIT C

**From:**     Mekall Kaltenbach
**To:**        Simon, Steve (WP); Perazzone, Kyle (WP); Steve Smith
**Cc:**        Kuerzdoerfer, Lisa (WP); Lisle, Roland (WP); Hackett, Shannon (WP)
**Subject:**  RE: Pirch/WP - Termination Notice
**Date:**     Tuesday, March 26, 2024 1:42:43 PM
**Attachments:** image001.png
                image002.png
                image003.png
                image004.png
                Public facing statement- clean.docx

Hi Steve,

I currently do not have any communication I can provide other than the attached public announcement. I will let you know when I have further communication I can provide.

Thanks
Mekall

---

**From:** Simon, Steve (WP) <Steve.Simon@worldpay.com>
**Sent:** Tuesday, March 26, 2024 7:58 AM
**To:** Perazzone, Kyle (WP) <Kyle.Perazzone@worldpay.com>; Steve Smith <steve.smith@pirch.com>; Mekall Kaltenbach <mekall.kaltenbach@pirch.com>
**Cc:** Kuerzdoerfer, Lisa (WP) <Lisa.Kuerzdoerfer@worldpay.com>; Lisle, Roland (WP) <Roland.Lisle@worldpay.com>; Hackett, Shannon (WP) <Shannon.Hackett@worldpay.com>
**Subject:** RE: Pirch/WP - Termination Notice
**Importance:** High

> Some people who received this message don't often get email from steve.simon@worldpay.com. Learn why this is important

Steve and Mekall, it is imperative that we speak with you today.  We have sent several emails and tried to call Mekall several times as well and have not received a reply.

Regards,

Steve

---

**From:** Perazzone, Kyle (WP) <Kyle.Perazzone@worldpay.com>
**Sent:** Friday, March 22, 2024 10:56 AM
**To:** Steve Smith <steve.smith@pirch.com>; Mekall Kaltenbach <mekall.kaltenbach@pirch.com>
**Cc:** Kuerzdoerfer, Lisa (WP) <Lisa.Kuerzdoerfer@worldpay.com>; Lisle, Roland (WP) <Roland.Lisle@worldpay.com>; Hackett, Shannon (WP) <Shannon.Hackett@worldpay.com>; Simon, Steve (WP) <Steve.Simon@worldpay.com>
**Subject:** RE: Pirch/WP - Termination Notice

Hello,

We saw the news that Pirch has paused operations. Chargebacks have spiked, building a substantial collections balance owed to Worldpay.

Please let us know when you are available for a call. We would like to speak with you today.

Thanks,

**Kyle Perazzone**
Senior Credit Risk Manager
Credit Risk Management

**T:** +1 (678) 587-1035
**E:** Kyle.Perazzone@worldpay.com



---

**From:** Perazzone, Kyle (WP)
**Sent:** Thursday, March 21, 2024 12:26 PM
**To:** 'Steve Smith' <steve.smith@pirch.com>; 'Mekall Kaltenbach' <mekall.kaltenbach@pirch.com>
**Cc:** Kuerzdoerfer, Lisa (WP) <Lisa.Kuerzdoerfer@worldpay.com>; Lisle, Roland (WP) <Roland.Lisle@worldpay.com>; Hackett, Shannon (WP) <Shannon.Hackett@worldpay.com>; Simon, Steve (WP) <Steve.Simon@worldpay.com>
**Subject:** RE: Pirch/WP - Termination Notice

Steve and Mekall,

I just left a VM for Mekall. Can we please set up a call ASAP?

Thanks,

**Kyle Perazzone**
Senior Credit Risk Manager
Credit Risk Management

**T:** +1 (678) 587-1035
**E:** Kyle.Perazzone@worldpay.com



**From:** Perazzone, Kyle (WP)
**Sent:** Thursday, March 14, 2024 3:18 PM
**To:** 'Steve Smith' <steve.smith@pirch.com>; 'Mekall Kaltenbach' <mekall.kaltenbach@pirch.com>
**Cc:** Kuerzdoerfer, Lisa (WP) <Lisa.Kuerzdoerfer@worldpay.com>; Lisle, Roland (WP) <Roland.Lisle@worldpay.com>; Hackett, Shannon (WP) <Shannon.Hackett@worldpay.com>; Simon, Steve (WP) <Steve.Simon@worldpay.com>
**Subject:** RE: Pirch/WP - Termination Notice

Steve and Mekall,

Thank you for the calls last week and providing the requested follow up information. Please see attached for a revised termination notice, extending the previous termination date by 30 days to April 6, 2024.

I recently sent some questions to Mekall related to the timing on cutting over to the new processor and the increase in chargebacks from February. If you could get back to us on those questions, it would be appreciated.

Thank you,

**Kyle Perazzone**
Senior Credit Risk Manager
Credit Risk Management

**T:** +1 (678) 587-1035
**E:** Kyle.Perazzone@worldpay.com



---

**From:** Perazzone, Kyle
**Sent:** Tuesday, February 6, 2024 4:56 PM
**To:** Steve Smith <steve.smith@pirch.com>; Mekall Kaltenbach <mekall.kaltenbach@pirch.com>
**Cc:** Kuerzdoerfer, Lisa <Lisa.Kuerzdoerfer@fisglobal.com>; Lisle, Roland <Roland.Lisle@fisglobal.com>; Hackett, Shannon <Shannon.Hackett@fisglobal.com>; Simon, Steve <Steve.Simon@fisglobal.com>; Perazzone, Kyle <Kyle.Perazzone@fisglobal.com>
**Subject:** Pirch/WP - Termination Notice

Steve and Mekall,

We appreciate your time on the call yesterday. As discussed, please see attached for the 30-day termination notice, which includes details on a partial settlement hold that will be implemented next

week. After sales are moved to another provider, Pirch must keep the bank account on file open in accordance with the agreement so that Worldpay can debit the account for trailing refund and chargeback activity.

Also as discussed, it would be helpful if you could please provide the following:

- Monthly financials for October 2023 – January 2024
- Confirm the amount of inventory reported on the December 31, 2023 balance sheet that is related to orders in which Pirch already received a customer deposit and inventory is being held for the customer
- A copy of Pirch's backlog with outstanding orders as of December 31, 2023

Thank you,

**Kyle Perazzone**
Senior Credit Risk Manager
Credit Risk Management

**T:** +1 (678) 587-1035
**E:** Kyle.Perazzone@fisglobal.com



The information contained in this message is proprietary and/or confidential. If you are not the intended recipient, please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately. In addition, please be aware that any message addressed to our domain is subject to archiving and review by persons other than the intended recipient. Thank you. Message Encrypted via TLS connection

# EXHIBIT D



March 14, 2024

**VIA ELECTRONIC MAIL**
Pirch, Inc.
9620 Towne Centre Drive
Suite 100
San Diego, CA 82121
Attn: Steve Smith

**Re: Revised Termination Notice**

Dear Mr. Smith,

Pursuant to Section 13 (iv) of the Bank Card Merchant Agreement ("Agreement") executed by and among Merchant and Processor on November 9, 2015, Processor is entitled to terminate the Agreement if Processor reasonably believes that there has been a material deterioration in Merchant's financial condition.

Based on the information evaluated to date, Processor believes a material deterioration has occurred and accordingly, this letter constitutes formal notice of termination. Merchant shall have 30 days following receipt of this notice to transition off Processor's system. Merchant must keep the Account open in accordance with Section 19 of the Agreement. Starting on February 12th, 2024, Processor will withhold $15,000.00 of daily sales until Merchant is fully transitioned off Processor's system as a termination reserve and the reserve will be returned to Merchant once the chargeback risk has passed.

This revised termination notice is served on you by email and by courier post and is deemed served on the date the email is sent. This revised termination notice supersedes the previous notice that was sent on February 6, 2024. The Agreement will terminate effective April 6, 2024 (the "Termination Date"). From the Termination Date, no further Transactions are to be handled under the terms of the Agreement.

Sincerely,

/s/ Kyle Perazzone

Kyle Perazzone
Senior Credit Risk Manager, Worldpay